# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### (MONROE DIVISION)

| | |
|---|---|
| MICHAEL BARBREE and GLEN WALKER, Derivatively on Behalf of CENTURYLINK, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> MARTHA H. BEJAR, VIRGINIA BOULET, PETER C. BROWN, W. BRUCE HANKS, MARY L. LANDRIEU, HARVEY P. PERRY, GLEN F. POST, III, MICHAEL J. ROBERTS, and LAURIE A. SIEGEL, <br><br> Defendants, <br><br> and, <br><br> CENTURYLINK, INC., <br><br> Nominal Defendant. | Index No: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Michael Barbree and Glen Walker ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant CenturyLink, Inc. ("CenturyLink" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by CenturyLink with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of CenturyLink against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, corporate waste, and unjust enrichment that occurred between January 1, 2013 and the present (the "Relevant Period") and have caused substantial harm to CenturyLink.

2.      CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States.  It operates through two segments: Business and Consumer.  The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services.

3.      Throughout the Relevant Period, Defendants (defined below) made materially false and/or misleading statements and/or failed to disclose material adverse facts about the Company's business, operations and compliance policies.  Specifically, Defendants failed to disclose that: (a) CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (b) CenturyLink's illicit practices were designed to allow CenturyLink to gain an advantage over its competitors and to increase profits; (c) CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and (d) CenturyLink's revenues were the product of illicit conduct and were unsustainable.

4.      As a result of the foregoing, Defendants' statements during the Relevant Period were false and misleading and/or lacked a reasonable basis.

5.      On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme."  The article reported on a lawsuit, recently filed in Arizona state superior court by former CenturyLink employee Heidi Heiser, alleging that Heiser

"was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left customers paying millions of dollars for accounts they didn't request." The *Bloomberg* article stated that Heiser "was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board."

6.      As a result of this news, the price of CenturyLink shares dropped $1.23 per share to close at $25.72 per share on June 16, 2017, a decline of nearly 5% on volume of 43 million shares.

7.      Then, on June 19, 2017, *Bloomberg* reported that a consumer complaint had been filed against CenturyLink based on the whistleblower complaint alleging fraud, unfair competition and unjust enrichment.

8.      As a result of this news, CenturyLink share price declined another $0.36 per share to close at $25.36 per share on June 19, 2017.

## JURSIDICTION AND VENUE

9.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

10.     Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

A.      **Plaintiffs**

11.     ***Plaintiff Michael Barbree*** ("Plaintiff Barbree") is a current owner of CenturyLink

stock and has held the stock during the time of Defendants' continuous illegal and wrongful course of conduct alleged herein.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of the State of Georgia.

12.     ***Plaintiff Glen Walker*** ("Plaintiff Walker") is a current owner of CenturyLink stock and has held the stock during the time of Defendants' continuous illegal and wrongful course of conduct alleged herein.   Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of the State of Washington.

**B.**     **Nominal Defendant**

13.     ***Nominal Defendant CenturyLink*** is a is a Louisiana corporation headquartered at 100 CenturyLink Drive, Monroe, Louisiana 71203. CenturyLink's common stock trades on the NYSE under the symbol "CTL."

**C.**     **Director Defendants**

14.     ***Defendant Martha H. Bejar*** ("Bejar") has been a director of the Company since January 2016.  Bejar is a member of the Audit Committee and the Risk Evaluation Committee. Defendant Bejar is a citizen of Florida.

15.     ***Defendant Virginia Boulet*** ("Boulet") has been a director of the Company since 1995.  Boulet is a member of the Human Resources and Compensation Committee and Chair of the Nominating and Corporate Governance Committee.   Defendant Boulet is a citizen of Louisiana.

16.     ***Defendant Peter C. Brown*** ("Brown") has been a director of the Company since 2009.  Brown is a member of the Audit Committee and a member of the Risk Evaluation Committee.  Defendant Brown is a citizen of Missouri.

17.     **Defendant W. Bruce Hanks** ("Hanks") has been a director of the Company since 1992. Hanks is the Chair of the Audit Committee and the Risk Evaluation Committee. Defendant Hanks is a citizen of Louisiana.

18.     **Defendant Mary L. Landrieu** ("Landrieu") has been a director of the Company since 2015. Landrieu is a member of the Nominating and Corporate Governance Committee. Defendant Landrieu is a citizen of the District of Columbia.

19.     **Defendant Harvey P. Perry** ("Perry") has been a director of the Company since 1990. Perry is a member of the Risk Evaluation Committee. Defendant Perry is a citizen of Louisiana.

20.     **Defendant Glen F. Post, III** ("Post") has been a director of the Company since 1985. Post founded the Company and is, and at all relevant times was, Chief Executive Officer ("CEO"), President and a director of CenturyLink. Defendant Post is a citizen of Louisiana.

21.     **Defendant Michael J. Roberts** ("Roberts") has been a director of the Company since 2011. Roberts is a member of the Human Resources and Compensation Committee. Defendant Roberts is a citizen of California.

22.     **Defendant Laurie A. Siegel** ("Siegel") has been a director of the Company since 2009. Siegel is the Chair of the Human Resources and Compensation Committee. Defendant Siegel is a citizen of New Jersey.

23.     Defendants Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Post, Roberts, and Siegel are hereinafter referred to as "Defendants".

## THE COMPANY'S CODE OF CONDUCT

24.     Pursuant to the Company's Code of Conduct,

**Fairness – The Golden Rule**

We will strive to:

- Exercise fairness in all dealings with customers.
- Treat business associates fairly in all transactions.
- Compensate and promote employees in an equitable manner.
- Be fair in efforts to meet and exceed the expectations of our shareholders.
- Treat others as we would like to be treated.

**Honesty and Integrity**

We will:

- Be truthful in all dealings with customers, employees, shareholders, business associates and the general public.
- Strive to conduct ourselves in a manner that will merit the respect of customers, employees, shareholders, business associates and the general public.

\*        \*        \*

**Who Is Required to Follow the Code?**

To achieve our financial and operational goals we must work together as a team, across organizational and geographic boundaries, to meet the evolving needs of our customers. This same team-oriented approach applies to the pursuit of our corporate ethics and compliance goals. As such, this Code applies to all CenturyLink "team members," which includes *all CenturyLink employees, officers and members of the Board of Directors*.

All employees of CenturyLink, Inc., its subsidiaries, and majority-owned and controlled affiliates ("CenturyLink" or the "Company") are expected to carefully read and follow the policies in this Code. As used in this Code, "employees" means all individuals employed by the Company, whether on a regular or temporary basis, and whether on a full- or part-time basis. However, the Code does not change the terms of your employment with CenturyLink. [Emphasis added].

## SUBSTANTIVE ALLEGATIONS

25.     CenturyLink provides various communications services to residential, business, wholesale and governmental customers in the United States.  It operates through two segments:

6

Business and Consumer. The Company offers broadband, Ethernet, colocation, video entertainment and satellite digital television services. The Company has over 5 million subscribers in a 37-state service area.

26.     On June 14, 2017, former CenturyLink employee Heidi Heiser ("Heiser") filed a whistleblower complaint in the Superior Court of Arizona for Maricopa County alleging that she was terminated for reporting to her supervisors and the CEO unlawful billing practices she observed and refused to take part in as a sales representative. *Heiser v. CenturyLink, Inc.*, No. CV2017-008928 (Maricopa Cty. Super. Ct.).

27.     As explained in the Heiser complaint, Defendants maintained an incentive program(s) for their employees and agents which provided financial incentives to charge customers for services they did not order and/or to overcharge customers for services they did order. Rather than uphold its duty to act in good faith and to ensure that it carefully charged consumers only in the correct amounts, and for services that consumers authorized, Defendants shifted that burden to consumers and essentially dared them to locate the overcharges and then demand refunds.

28.     Fee generation is at the heart of Defendants' business model. At all relevant times, Defendants sought to maximize the number of services which they could bill customers. Defendants had a financial incentive to employ and continue such incentive programs, as it increased their revenues and profits. At the same time, Defendants' employment of such incentive programs harmed and injured consumers financially as they paid the charges that were improperly imposed in order to keep their accounts current.

29.     Ms. Heiser's allegations of what she observed, and what the CenturyLink corporate culture encouraged, are consistent with the experiences of thousands of consumers who have been

misled by CenturyLink.

30.    A digital revolt against CenturyLink's fraud has been fomented by subscribers on social media and consumer watchdog websites.

31.    By way of example, the following consumer complaints are emblematic of CenturyLink's practices, as described in the Heiser complaint:



32.    These types of communications reporting overcharges and blaming consumers as opposed to CenturyLink taking responsibility for its billing practices and conduct, are similar to those posted online by other victims of Defendants' practices, demonstrating a pattern and practice of Defendants' violation of applicable consumer protection statutes, breach of customer contracts, and unjust enrichment at the expense of its customers.  Rather than take care to ensure that they only billed consumers for amounts actually authorized and agreed to, as Defendants had a duty to

8

do, Defendants attempt to shift the burden to the consumers to locate overcharges and then demand refunds within a short time frame.  The amounts billed to each consumer each month are relatively small (less than $200) and therefore, Defendants know that certain consumers will have little time to actively monitor and immediately seek corrections when appropriate.   Defendants attempt to take advantage and exploit this.  This type of catch-us-if-you-can policy was unfair, deceptive and misleading.  By way of example, an outraged subscriber posted the following communication on social media:



33.      Subscribers also post their written communications complaining of CenturyLink creating and billing for duplicate accounts.      Upon complaining, CenturyLink blamed the

subscriber or implied that the subscriber was somehow under "fraud review."  For example, one subscriber posted the following communication regarding CenturyLink's duplicative billing:



34.    Thousands of pages of consumer complaints, primarily focused on fraudulent billing practices, were lodged on Consumer Affairs' website.  Many consumers state that the only reason they rated CenturyLink with "one star" was that "zero stars" is not an option. *See, e.g.,* https://www.consumeraffairs.com/cell_phones/centurylink.html.

35.    Upon information and belief, at least one State's Attorney General has investigated and entered into an "assurance of discontinuance" with CenturyLink which prohibits the conduct described herein, however the conduct remains ongoing.

36.    The foregoing demonstrates that Defendants have been engaged in far more than the odd mistake or rare miscommunication. Rather, it demonstrates that Defendants acted intentionally to create a new profit center at the expense of unsuspecting consumers who had placed their trust in Defendants to bill them accurately, honestly, and only withdraw from their bank accounts (many which were set up for electronic autopay deductions) the amounts actually due and agreed to.

37.    The offending and unlawful conduct by CenturyLink, throughout the United States, includes, but is not limited to:

- Billing consumers for phone lines or service items never requested by consumers;

- Billing consumers higher rates than the rates quoted during the sales calls;

- Billing consumers early termination fees when they cancelled the services due to higher rates;

- Billing consumers when they cancelled their service upon learning the quality was not as represented;

- Billing consumers for periods of service before the service was connected, for products never received, and failing to credit consumers for these erroneous charges;

- Billing consumers for services and products that the consumer never requested without giving the consumer a credit for these charges;

- Failing to process consumers' service cancellation requests in a timely

11

manner and billing them for the period of the time the service remained connected following the request for cancellation, without providing a credit for this time period; and

- Charging consumers full price for leased modems that consumers returned to CenturyLink within the required timeframe, and then referring the consumers account to collections when the consumer refused to pay for the returned modem.

**MATERIAL MISSTATEMENTS
AND OMISSIONS DURING THE RELEVANT PERIOD**

38.     On March 1, 2013, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2012 (the "2012 10-K").  For the year, the Company reported operating revenues of $18.4 billion, compared to operating revenue of $15.4 billion in the previous year, and adjusted net income of $1.66 billion, compared to adjusted net income of $1.63 billion in the previous year.

39.     With respect to the Company's sales practices, the 2012 10-K stated in relevant part:

> **Sales and Marketing**
>
> We maintain local offices in most of the larger population centers within our local service area.  These offices provide sales and customer support services in the community.  We also rely on our call center personnel to promote sales of services that meet the needs of our customers.  Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.
>
> *     *     *
>
> Our approach to our regional markets' residential customers emphasizes customer-oriented sales, marketing and service with a local presence.  We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties.  We support our distribution with direct mail, bill inserts, newspaper advertising, website promotions, public relations activities and sponsorship of

12

community events and sports venues.

Our approach to our regional markets' business and government customers includes a commitment to deliver communications products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to be a comprehensive communications solution for our small office, mid-sized and select enterprise business and government customers.

Our approach to our wholesale markets' customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our approach to our enterprise market – network customers includes a commitment to deliver network products and services that meet existing and future customer needs by offering private line, broadband, MPLS and hosting services and well as local and long-distance services.

Our enterprise market – data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

40.   With respect to regulations and compliance, the 2012 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications in our local service area.

These agencies issue rules to protect consumers and promote competition; they set the rates that telecommunication companies charge each other for exchanging traffic; and they have established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region.

\*      \*      \*

**Federal Regulation**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on non-discriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

41.     With respect to the Company's ethics, the 2012 10-K stated in relevant part:

We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, including our principal executive officer and senior financial officers, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange. In the event that we make any changes (other than by a technical, administrative or non-substantive amendment) to, or applicable to our directors or executive officers, we intend to disclose these events on our website or in a report on Form 8-K filed with the SEC. These codes of conduct, as well as copies of our guidelines on significant governance issues and the charters of our audit committee, compensation committee, nominating and corporate governance committee and risk evaluation committee, are also available in the "Corporate Governance" section of our website at www.centurylink.com/Pages/AboutUs/Governance/ or in print to any shareholder who requests them by sending a written request to our Corporate Secretary at CenturyLink, Inc., 100 CenturyLink Drive, Monroe, Louisiana, 71203.

42.     On February 27, 2014, CenturyLink filed a Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2013 (the "2013 10-K"). For the quarter, CenturyLink reported net income of $239 million, or $0.41 per diluted share, on revenue of $4.54 billion, compared to net income of $233 million, or $0.37 per diluted share, on revenue of $4.58 billion for the same period in the prior year. For 2013, CenturyLink reported a net loss of $239 million, or ($0.40) per diluted share, on revenue of $18.01 billion, compared to net income of $777 million, or $1.25 per diluted share, on revenue of $18.38 billion for 2012.

43.    The 2013 10-K stated in relevant part:

**Products and Services**

Our products and services include local and long-distance, broadband, private line (including special access, which we market to wholesale and business customers), MLPS, data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video services and other ancillary services.

We offer our customers the ability to bundle together several products and services. For example, we offer integrated and unlimited local and long-distance services. Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services. We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*     *     *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area. These offices provide sales and customer support services in the community. We also rely on our call center personnel to promote sales of services that meet the needs of our customers. Our strategy is to enhance our communications services by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

*     *     *

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence. We market our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties. We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Our approach to our business and governmental customers includes a commitment to deliver communications and network products and services that meet existing and future business needs through bundles of services and integrated service offerings. Our focus is to

be a comprehensive communications solution for our small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives, inbound call centers, telemarketing and third parties.

We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, telemarketing and third parties.

Our approach to our wholesale customers includes a commitment to deliver communications solutions that meet existing and future needs of national network telecommunications providers through bandwidth growth and quality of services.

Our data hosting operations utilize a solution-based selling approach. By working directly with potential and existing clients, we are able to understand our clients' IT infrastructure and long-term goals. We also market through indirect channels, including collaborations with existing clients and technology providers, telecommunications companies and system integrators.

44.     With respect to regulations and compliance, the 2013 10-K stated in part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

*          *          *

**Federal Regulation**

**General**

> We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

45.     With respect to the Company's ethics, the 2013 10-K reiterated the information stated in the 2012 10-K:

> We have adopted written codes of conduct that serve as the code of ethics applicable to our directors, officers and employees, in accordance with applicable laws and rules promulgated by the SEC and the New York Stock Exchange.

46.     The 2013 10-K was signed by Defendant Post and stated that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

47.     On May 9, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, CenturyLink reported net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion, compared to net income of $298 million, or $0.48 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

48.     The Q1 2014 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. We strive to maintain our customer relationships by, among other

17

things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

49.     The Q1 2014 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50.     On August 7, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, CenturyLink reported net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion, compared to net income of $269 million, or $0.44 per diluted share, on revenue of $4.53 billion for the same period in the prior year.

51.     The Q2 2014 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

52.     The Q2 2014 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

53.     On November 4, 2014, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion, compared to a net loss of

$1.05 billion, or ($1.76) per diluted share, on revenue of $4.52 billion for the same period in the prior year.

54.     The Q3 2014 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, public access, wireless, video and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

55.     The Q3 2014 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

56.     On February 24, 2015, CenturyLink filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2014 (the "2014 10-K"). For the quarter, CenturyLink reported net income of $188 million, or $0.33 per diluted share, on revenue of $4.44 billion, compared to net income of $239 million, or $0.41 per diluted share, on revenue of $4.54 billion for the same period in the prior year. For 2014, CenturyLink reported net income of $772 million, or $1.36 per diluted share, on revenue of $18.03 billion, compared to a net loss of $239 million, or ($0.40) per diluted share, on revenue of $18.01 billion for 2013.

57.     The 2014 10-K stated in relevant part:

> **Products and Services**
>
> Our products and services include local and long-distance, broadband, private line (including special access), MPLS, data

integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services.

We offer our customers the ability to bundle together several products and services.   For example, we offer integrated and unlimited local and long-distance services.  Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services.  We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*  *  *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area.   These offices provide sales and customer support services in the community.  We also rely on our call center personnel to promote sales of services that meet the needs of our customers.  Our strategy is to enhance our sales by offering a comprehensive bundle of services and deploying new technologies to further enhance customer loyalty.

*  *  *

Our approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.  We market our products and services primarily through direct sales representatives,   inbound   call   centers,   local   retail   stores, telemarketing and third parties.  We support our distribution with direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly,  our  approach  to  our  business,  wholesale  and governmental  customers  includes  a  commitment  to  provide comprehensive communications solutions for small office, mid-sized and select enterprise business and governmental customers. We market our products and services primarily through direct sales representatives,   inbound   call   centers,   telemarketing  and  third parties.

We also market through indirect channels, including collaboration with existing clients and technology providers, telecommunications

companies and system integrators.

58.     With respect to regulations and compliance, the 2014 10-K stated in relevant part:

**Regulation**

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally established USF to support the provision of services to high-cost areas. In most states, local voice service, switched and special access services and interconnection services are subject to price regulation, although the extent of regulation varies by type of service and geographic region. In addition, we are required to maintain licenses with the FCC and with state utility commissions. Laws and regulations in many states restrict the manner in which a licensed entity can interact with affiliates, transfer assets, issue debt and engage in other business activities, and many acquisitions and divestitures require approval by the FCC and some state commissions.

*     *     *

**Federal Regulation**

**General**

We are required to comply with the Communications Act of 1934, which requires us to offer services at just and reasonable rates and on nondiscriminatory terms, as well as the Telecommunications Act of 1996, which amended the Communications Act of 1934 primarily to promote competition.

59.     The 2014 10-K was signed by Defendant Post and stated that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

60.     On May 6, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2015

(the "Q1 2015 10-Q"). For the quarter, CenturyLink reported net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion, compared to net income of $203 million, or $0.35 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

61.     The Q1 2015 10-Q stated in part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential, business, governmental and wholesale customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

62.     The Q1 2015 10-Q was signed by and/or contained a certification of the Defendant Post and stated that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

63.     Then, on June 24, 2015, the Company held an analyst day during which CenturyLink's management, including defendant Post, discussed the Company's business and prospects. During the day's presentations, CenturyLink surprised investors and analysts by disclosing unexpected softness in the Company's sales following the sudden departure of Karen Puckett ("Puckett") (CenturyLink's President of Global Markets), who had been tasked with leading the reorganization of the Company's salesforce and new sales initiatives little more than six months previously. Equity analysts following the Company expressed concern at Ms. Puckett's abrupt retirement so soon after taking the reins of a major sales initiative, as it exposed unexpected turbulence in the Company's critical sales operations and an increased reliance on growing consumer sales to offset weakness in CenturyLink's business segment.

64.     On this news, the price of CenturyLink common stock dropped $2.63 per share, or more than 8%, over two trading days to close at $29.92 per share on June 25, 2015.

65.     On August 6, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q").  For the quarter, CenturyLink reported net income of $143 million, or $0.26 per diluted share, on revenue of $4.42 billion, compared to net income of $193 million, or $0.34 per diluted share, on revenue of $4.54 billion for the same period in the prior year.

66.     The Q2 2015 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of communications services to our residential and business customers. Our communications services include local and long-distance, broadband, private line (including special access), Multi-Protocol Label Switching ("MPLS"), data integration, managed hosting (including cloud hosting), colocation, Ethernet, network and public access, video, wireless and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

67.     The Q2 2015 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

68.     On November 5, 2015, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q").  For the quarter, CenturyLink reported net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion, compared to net income of $188 million, or $0.33 per diluted share, on revenue of $4.51 billion for the same period in the prior year.

69.     The Q3 2015 10-Q stated in relevant part:

We are an integrated communications company engaged primarily
in providing an array of communications services to our residential
and business customers. Our communications services include local
and long-distance, highspeed Internet, Multi-Protocol Label
Switching ("MPLS"), private line (including special access), data
integration, Ethernet, colocation, managed hosting (including cloud
hosting), network, public access, video, wireless and other ancillary
services. We strive to maintain our customer relationships by,
among other things, bundling our service offerings to provide our
customers with a complete offering of integrated communications
services.

70.     The Q3 2015 10-Q was signed by and/or contained a certification of Defendant Post

and stated that the financial information contained in the Q3 2015 10-Q was accurate and disclosed

any material changes to the Company's internal control over financial reporting.

71.     On February 25, 2016, CenturyLink filed a Form 10-K with the SEC announcing

the Company's financial and operating results for the fiscal fourth quarter and year ended

December 31, 2015 (the "2015 10-K"). For the year, the Company reported operating revenues of

$17.9 billion, compared to operating revenues of $18 billion in the previous year, and adjusted net

income of $1.5 billion, compared to adjusted net income of $1.49 billion in the previous year.

72.     The 2015 10-K stated in relevant part:

**Products and Services**

Our products and services include local and long-distance voice,
highspeed Internet, MPLS, private line (including special access),
data integration, Ethernet, colocation, managed hosting (including
cloud hosting), network, public access, video, wireless and other
ancillary services.

We offer our customers the ability to bundle together several
products and services. For example, we offer integrated and
unlimited local and long-distance voice services. Our customers can
also bundle two or more services such as highspeed Internet, video
(including DIRECTV through our strategic partnership), voice and
Verizon Wireless (through our strategic partnership) services. We

believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*          *          *

### Sales and Marketing

We maintain local offices in most of the larger population centers within our local service area.  These offices provide sales and customer support services in the community.  We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers.  Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands.

Our offerings include both standalone services and bundled services designed to meet the needs of different customer segments.

*          *          *

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.  Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms.  We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers.  Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms.  We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

73.     With respect to regulations and compliance, the 2015 10-K stated in relevant part:

25

Regulation

*     *     *

We are subject to significant regulation by the Federal Communications Commission ("FCC"), which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

*     *     *

Federal Regulation

General

We are required to comply with the Communications Act of 1934. Among other things, this law requires our ILECs to offer various of our legacy services at just and reasonable rates and on non-discriminatory terms.   The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

74.    The 2015 10-K was signed by Defendant Post and stated that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

75.    On May 5, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, CenturyLink reported net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion, compared to net income of $192 million, or $0.34 per diluted share, on revenue of $4.45 billion for the same period in the prior year.

76.    The Q1 2016 10-Q stated in relevant part:

We are an integrated communications company engaged primarily

in providing an array of communications services to our residential
and business customers. Our communications services include local
and long-distance voice, high-speed Internet, Multi-Protocol Label
Switching ("MPLS"), private line (including special access), data
integration, Ethernet, colocation, managed hosting (including cloud
hosting), network, public access, video, wireless and other ancillary
services. We strive to maintain our customer relationships by,
among other things, bundling our service offerings to provide our
customers with a complete offering of integrated communications
services.

77.     The Q1 2016 10-Q was signed by and/or contained a certification of Defendant Post

and stated that the financial information contained in the Q1 2016 10-Q was accurate and disclosed

any material changes to the Company's internal control over financial reporting.

78.     On August 4, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the

SEC announcing the Company's financial and operating results for the quarter ended June 30,

2016 (the "Q2 2016 10-Q"). For the quarter, CenturyLink reported net income of $196 million,

or $0.36 per diluted share, on revenue of $4.4 billion, compared to net income of $143 million, or

$0.26 per diluted share, on revenue of $4.42 billion for the same period in the prior year.

79.     The Q2 2016 10-Q stated in relevant part:

We are an integrated communications company engaged primarily
in providing an array of services to our residential and business
customers. Our communications services include local and long-
distance voice, broadband, Multi- Protocol Label Switching
("MPLS"), private line (including special access), Ethernet,
colocation, hosting (including cloud hosting and managed hosting),
data integration, video, network, public access, Voice over Internet
Protocol ("VoIP"), information technology and other ancillary
services. We strive to maintain our customer relationships by,
among other things, bundling our service offerings to provide our
customers with a complete offering of integrated communications
services.

80.     The Q2 2016 10-Q was signed by and/or contained a certification of Defendant Post

and stated that the financial information contained in the Q2 2016 10-Q was accurate and disclosed

27

any material changes to the Company's internal control over financial reporting.

81.     On November 4, 2016, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended September 30, 2016 (the "Q3 2016 10-Q").  For the quarter, CenturyLink reported net income of $152 million, or $0.28 per diluted share, on revenue of $4.38 billion, compared to net income of $205 million, or $0.37 per diluted share, on revenue of $4.55 billion for the same period in the prior year.

82.     The Q3 2016 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers.  Our communications services include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

83.     The Q3 2016 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q3 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

84.     On February 23, 2017, CenturyLink filed an Annual Report on Form 10-K with the SEC announcing the Company's financial and operating results for the fiscal fourth quarter and year ended December 31, 2016 (the "2016 10-K").  For the quarter, CenturyLink reported net income of $42 million, or $0.08 per diluted share, on revenue of $4.29 billion, compared to net income of $338 million, or $0.62 per diluted share, on revenue of $4.48 billion for the same period in the prior year.  For 2016, CenturyLink reported net income of $626 million, or $1.16 per diluted

28

share, on revenue of $17.47 billion, compared to net income of $878 million, or $1.58 per diluted

share, on revenue of $17.9 billion for 2015.

85.   The 2016 10-K stated in relevant part:

**Products and Services**

*    *    *

Our products and services include local and long-distance voice, broadband, MPLS, private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, VoIP, information technology and other ancillary services.

We offer our customers the ability to bundle together several products and services.   For example, we offer integrated and unlimited local and long-distance voice services.  Our customers can also bundle two or more services such as broadband, video (including DIRECTV through our strategic partnership), voice and Verizon Wireless (through our strategic partnership) services.  We believe our customers value the convenience and price discounts associated with receiving multiple services through a single company.

*    *    *

**Sales and Marketing**

We maintain local offices in most of the larger population centers within our local service area.   These offices provide sales and customer support services in the community.  We also rely on our call center personnel and a variety of channel partners to promote sales of services that meet the needs of our customers.  Our sales and marketing strategy is to enhance our sales by offering solutions tailored to the needs of our various customers and promoting our brands.  Our offerings include both stand-alone services and bundled services designed to meet the needs of different customer segments.

*    *    *

Our sales and marketing approach to our residential customers emphasizes customer-oriented sales, marketing and service with a local presence.  Our marketing plans include marketing our products and services primarily through direct sales representatives, inbound

call centers, local retail stores, telemarketing and third parties, including retailers, satellite television providers, door to door sales agents and digital marketing firms. We support our distribution with digital marketing, direct mail, bill inserts, newspaper and television advertising, website promotions, public relations activities and sponsorship of community events and sports venues.

Similarly, our sales and marketing approach to our business customers includes a commitment to provide comprehensive communications and IT solutions for business, wholesale and governmental customers of all sizes, ranging from small offices to select enterprise customers. We strive to offer our business customers stable, reliable, secure and trusted solutions. Our marketing plans include marketing our products and services primarily through digital advertising, direct sales representatives, inbound call centers, telemarketing and third parties, including telecommunications agents, system integrators, value-added resellers and other telecommunications firms. We support our distribution through digital advertising, events, television advertising, website promotions and public relations.

With respect to regulations and compliance, the 2016 10-K stated in part:

**Regulation**

\*      \*      \*

We are subject to significant regulation by the FCC, which regulates interstate communications, and state utility commissions, which regulate intrastate communications. These agencies (i) issue rules to protect consumers and promote competition, (ii) set the rates that telecommunication companies charge each other for exchanging traffic, and (iii) have traditionally developed and administered support programs designed to subsidize the provision of services to high-cost rural areas.

\*      \*      \*

**Federal Regulation**

**General**

We are required to comply with the Communications Act of 1934.

Among other things, this law requires our incumbent local exchange

30

carriers ("ILECs") to offer various legacy services at just and reasonable rates and on nondiscriminatory terms. The Telecommunications Act of 1996 materially amended the Communications Act of 1934, primarily to promote competition.

86.    The 2016 10-K was signed by Defendant Post and stated that the financial information contained in the 2016 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

87.    On May 5, 2017, CenturyLink filed a Quarterly Report on Form 10-Q with the SEC announcing the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 10-Q"). For the quarter, CenturyLink reported net income of $163 million, or $0.30 per diluted share, on revenue of $4.21 billion, compared to net income of $236 million, or $0.44 per diluted share, on revenue of $4.4 billion for the same period in the prior year.

88.    The Q1 2017 10-Q stated in relevant part:

> We are an integrated communications company engaged primarily in providing an array of services to our residential and business customers. Our communications services include local and long-distance voice, broadband, Multi-Protocol Label Switching ("MPLS"), private line (including special access), Ethernet, colocation, hosting (including cloud hosting and managed hosting), data integration, video, network, public access, Voice over Internet Protocol ("VoIP"), information technology and other ancillary services. We strive to maintain our customer relationships by, among other things, bundling our service offerings to provide our customers with a complete offering of integrated communications services.

89.    The Q1 2017 10-Q was signed by and/or contained a certification of Defendant Post and stated that the financial information contained in the Q1 2017 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

90.    The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's

business, operations and financial condition, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and misleading statements and/or failed to disclose that: (a) CenturyLink's policies allowed its employees to add services or lines to accounts without customer permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (b) CenturyLink's illicit practices were designed to allow it to gain an advantage over its competitors and to increase profits; (c) CenturyLink's illicit conduct was likely to subject it to heightened regulatory scrutiny; and (d) CenturyLink's revenues were the product of illicit conduct and were unsustainable.

91.     As a result of the foregoing, the above statements during the Relevant Period were false and misleading and/or lacked a reasonable basis.

92.     On June 16, 2017, *Bloomberg* published an article entitled "CenturyLink Is Accused of Running a Wells Fargo-Like Scheme." The *Bloomberg* article reported, in relevant part:

> A former CenturyLink Inc. employee claims she was fired for blowing the whistle on the telecommunications company's high-pressure sales culture that left customers paying millions of dollars for accounts they didn't request, according to a lawsuit filed this week in Arizona state superior court.
>
> *          *          *
>
> The plaintiff, Heidi Heiser, worked from her home for CenturyLink as a customer service and sales agent from August 2015 to October 2016. The suit claims she was fired days after notifying Chief Executive Officer Glen Post of the alleged scheme during a companywide question-and-answer session held on an internal message board.
>
> The complaint alleges CenturyLink "allowed persons who had a personal incentive to add services or lines to customer accounts to falsely indicate on the CenturyLink system the approval by a customer of new lines or services." This would sometimes result in charges that hadn't been authorized by customers, according to the

complaint.

\*          \*          \*

Heiser's complaint alleges that she became increasingly concerned about what she observed at CenturyLink after news of Wells Fargo & Co.'s regulatory troubles broke in September. In that case, Wells Fargo employees opened deposit and credit card accounts without customers' consent to earn incentives and meet sales goals. Without admitting wrongdoing, Wells Fargo ended up firing more than 5,000 employees and agreeing to pay $185 million in fines, in addition to compensating customers for fees related to the unauthorized accounts.

The complaint likens what Heiser said CenturyLink sales agents did to the Wells Fargo scandal and estimated the alleged unauthorized fees amounted to "many millions" of dollars. She says her concerns were bolstered by posts she had read on review websites.

A review of Yelp and Pissed Consumer finds evidence of irate customers.

"They signed me up unauthorized," wrote Sierrah U. of Bend, Ore., on Yelp in February 2015. "I was talking to someone interested in signing up two weeks ago after realizing my modem was incapable I told the guy I didn't want to sign up and I would call back later if I was still interested, he got really upset hung up on me. Two weeks later I receive a bill! With a ton a fees, I don't even have internet with them!"

When a customer complained about an unauthorized charge, customer service and sales agents like Heiser were directed "to inform the complaining customer that CenturyLink's system indicated the customer had approved the service," according to the complaint, and as a result "it was really the customer's word against CenturyLink."

"CenturyLink is going to be in a world of hurt if this turns out to be true," said Roger Entner, an analyst with Recon Analytics.

Initially, Heiser told her direct superiors about her suspicions and was told in response to her complaints to "stay positive and not to mention her concerns again," according to the complaint. Heiser didn't report her concerns to the Federal Communications Commission or the Occupational Safety and Health Administration, a division of the U.S. Department of Labor.

33

Five months before she was fired, Heiser said, she experienced dropped calls with customers due to what the complaint described as a "malfunctioning system." She reported the issue repeatedly to superiors, according to the complaint.  The dropped calls were allegedly cited by CenturyLink as the reason for her dismissal, which came two days after the question-and-answer session.

To lead the combined operations of CenturyLink and Level 3, activist investor Keith Meister's hedge fund, Corvex Management LLP, had sought a telecom veteran, prevailing with Storey's selection.  (Meister says Corvex has built up a 5.5 percent stake in CenturyLink.)  Still, Post, the current CEO, will stay on as executive chairman when Storey takes the helm.

Phone service giants such as AT&T Inc., Verizon Communications Inc., and Sprint have all settled cases in which third-party companies had been adding services to customers' phone bills without consent. These "cramming" issues typically involved $9.99 monthly charges for horoscopes and trivia games.  That is different from a telephone company employee who may be looking to meet sales goals by creating false accounts or adding services to existing accounts without the subscriber's knowledge or consent.

T-Mobile U.S. Inc. was the subject of a critical report in December from a labor group called Change to Win Retail Initiatives that said the carrier put its sales staff under pressure to meet difficult sales goals.  The pressure caused T-Mobile employees to force some customers to enroll in services they didn't necessarily want or authorize, according to the report. T-Mobile declined to comment on the allegation.

"When sales targets are unrealistic and employees' livelihoods are at stake, some people are going to take shortcuts," said Entner, the telecom analyst.

"Companies have the responsibility to make sure the goals are realistic.  You don't want to drive people to break the law."

93.     As a result of this news, the price of CenturyLink shares dropped $1.23 per share to close at $25.72 per share on June 16, 2017, a decline of nearly 5% on volume of 43 million shares.

94.     Then, on June 19, 2017, the *Bloomberg* published a second article entitled

"CenturyLink Faces Class-Action Lawsuit Seeking Up to $12 Billion." The article stated in part:

> The new lawsuit, filed in the central district of California late Sunday night, cites Heiser's suit, as well as similar accusations posted on social media and consumer review websites by people identifying themselves as CenturyLink customers, and accuses CenturyLink of fraud, unfair competition, and unjust enrichment.

> "Ms. Heiser's allegations of what she observed, and what CenturyLink corporate culture encouraged, are consistent with the experiences of hundreds of thousands and potentially millions of consumers who have been defrauded by CenturyLink," the complaint states. "It is estimated that the damages to consumers could range between $600 million and $12 billion, based on CenturyLink's 5.9 million subscribers."

> "The fact that a law firm is trying to leverage a wrongful termination suit into a putative class action lawsuit does not change our original position," Mark Molzen, a CenturyLink spokesman, said in a statement, adding that Heiser failed to report her allegations to the company's 24-hour Integrity Line. He said her claims "are completely inconsistent" with company policy and culture and that "we take these allegations seriously and are diligently investigating this matter."

> Class actions are common after contentious allegations against large companies. Sunday's lawsuit was brought on behalf of the consumers by the Geragos & Geragos law firm, led by celebrity attorney Mark J. Geragos. Heiser didn't report her concerns to the Federal Communications Commission or other authorities.

> The named plaintiffs in the case are Craig McLeod and Steven L. McCauley, both current customers of CenturyLink. During a conversation in early April with a sales agent on CenturyLink's website, McLeod, 65, was offered a faster internet link for an extra $2 a month with a two-year contract, and accepted, according to the complaint. He alleges he incurred considerably higher fees than quoted and was charged for a repair that never was made.

95.     As a result of this news, the price of CenturyLink shares declined another $0.36 per share to close at $25.36 per share on June 19, 2017.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

96.     Plaintiffs bring this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties, waste of corporate assets, and unjust enrichment by Defendants.

97.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

98.     Plaintiffs are current owners of CenturyLink stock and have held the stock during the time of Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to continue to hold stock in the Company throughout the duration of this action and are prepared to do so.

99.     During wrongful course of conduct at the Company, the Board consisted of Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

100.     The Board is currently comprised of eight (9) members: Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Post, Roberts, and Siegel.  Thus, Plaintiffs are required to show that a majority of the Demand Defendants, i.e., five (5) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

101.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

102.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to

prevent or remedy that situation.

103.    Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

104.    Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

105.    Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

106.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

107.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

**Defendant Post**

108.    Defendant Post is not disinterested or independent, and therefore, is incapable of considering demand because Post (as CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Post cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

109.    Post also lacks independence from Defendants Boulet, Owens, Roberts, and Siegel, defendants who are not disinterested and who exert influence over Post's compensation by virtue of their positions as representing the entire Compensation Committee.

**Defendants Bejar, Brown, and Hanks**

110.    As to defendants Bejar, Brown and Hanks because as members of the Audit Committee during the Relevant Period, they knowingly and deliberately participated in and approved the filing of false financial statements and other false SEC filings as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein.

**Defendants Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Post, Roberts, and Siegel**

111.    The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Bejar, Boulet, Brown, Hanks, Landrieu, Perry, Post, Roberts, and Siegel face a substantial likelihood of liability for repeatedly failing to comply with this duty.

**Defendants Bejar, Brown, Hanks, and Perry**

112.    Defendants Bejar, Brown, Hanks and Perry were members of the Risk Evaluation

Committee ("Evaluation Committee").  As members of the Evaluation Committee, Defendants Bejar, Brown, Hanks, and Perry were tasked with overseeing the Company's corporate compliance program and procedures.  In connection therewith, the Evaluation Committee was tasked with (i) reviewing periodically the effectiveness and adequacy of the Company's corporate compliance program and procedures and recommend to the Board any necessary proposed changes thereto and (ii) investigating any material instances of noncompliance.

113.   As members of the Evaluation Committee, Defendants Bejar, Brown, Hanks and Perry had full access to the Company's records, officers, employees and outside advisors and therefore was fully aware (or negligent in not knowing) of the activity alleged herein.

## CAUSES OF ACTION

## COUNT I

### (Against Defendants for Breach of Fiduciary Duties)

114.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

115.   Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

116.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

117.   Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to CenturyLink, Defendants caused the Company to make false and/or misleading statements and/or failed to disclose that: (i) CenturyLink's policies allowed its employees to add services or lines to accounts without customer

permission, resulting in millions of dollars in unauthorized charges to CenturyLink customers; (ii) accordingly, the Company's revenues were the product of illicit conduct and unsustainable; (iii) the foregoing illicit conduct was likely to subject CenturyLink to heightened regulatory scrutiny; and (iv) as a result of the foregoing, CenturyLink's public statements were materially false and misleading at all relevant times.

118.   Defendants had actual or constructive knowledge of the weaknesses of the Company's internal controls and that the Company was involved in fraudulent practices. Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

119.   As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

120.   As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## COUNT II

### (Against Defendants for Waste of Corporate Assets)

121.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

122.   As a result of the wrongdoing detailed herein and by failing to conduct proper

supervision, Defendants have caused the Company to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

123.   As a result of the waste of corporate assets, Defendants are liable to the Company.

124.   Plaintiffs, on behalf of the Company, have no adequate remedy at law.

COUNT III

(Against Defendants for Unjust Enrichment)

125.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

126.   By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company.  Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to the Company.

127.   Plaintiffs, as stockholders and representatives of the Company, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

128.   Plaintiffs, on behalf of the Company, have no adequate remedy at law.

REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.      Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: September 11, 2017

PENDLEY, BAUDIN & COFFIN

By: _Patw. Pendley_

Patrick W. Pendley
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Telephone: (888) 725-2477
Facsimile: (225) 687-6398
Email: pwpendley@pbclawfirm.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com

*Attorneys for Plaintiffs*

42